ORIGINAL

1  DANIEL G. BOGDEN
   United States Attorney
2  Nevada State Bar No. 2137
   DANIEL D. HOLLINGSWORTH
3  Assistant United States Attorney
   Nevada State Bar No. 1925
4  Lloyd D. George United States Courthouse
   333 Las Vegas Boulevard South, Suite 5000
5  Las Vegas, Nevada 89101
   Telephone: (702) 388-6336
6  Facsimile: (702) 388-6787
   E-mail: Daniel.Hollingsworth@usdoj.gov
7  Counsel for the United States of America



## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| Plaintiff, | ) 2:10-cv-0032-RLH-GWF |
| v. | ) |
| $1,150.00 IN UNITED STATES CURRENCY, | ) |
| Defendant. | ) |

### COMPLAINT FOR FORFEITURE IN REM

The United States of America, by and through Daniel G. Bogden, United States Attorney for the District of Nevada, and Daniel D. Hollingsworth, Assistant United States Attorney, in a civil cause for forfeiture, respectfully states as follows:

### SUBJECT MATTER JURISDICTION

1. This Court has jurisdiction under 19 U.S.C. §§ 1603, 1608, and 1610; Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions ("Fed. R. Civ. P. Supp. Rule"); 18 U.S.C. §§ 981 and 983; 28 U.S.C. §§ 1345, 1355, and 1395; and 31 U.S.C. § 5317(c)(2).

### IN REM JURISDICTION

2. This Court will have in rem jurisdiction over the $1,150.00 in United States Currency ("defendant") if this Court signs an Order for Summons and Warrant of Arrest in Rem for the Property

1  and the Clerk of the Court issues a Summons and Warrant of Arrest in Rem for the Property, which
2  will be executed upon the defendant and returned to the Court.

### VENUE

3. This Court has venue of this matter pursuant to 28 U.S.C. §§ 1355 and 1395 because the above-named defendant is now and, during the pendency of this action, will be in the jurisdiction of this Court and because the defendant was found in this judicial district.

### PARTICULAR DESCRIPTION

4. The defendant is more particularly described as follows: $1,150.00 in United States Currency obtained from a winning gaming ticket from the Rampart Casino.

### PLACE OF SEIZURE

5. On or about September 28, 2007, defendant was seized from the person of John Astarita, by duly authorized agents of the United States Immigration and Customs Enforcement ("ICE"), Las Vegas, Nevada. On or about October 24, 2007, the Nevada Gaming Control Board determined that it was a winning gaming ticket and it was exchanged for a check at the Rampart Hotel and Casino, 221 North Rampart Boulevard, Las Vegas, Nevada.

### CUSTODY OF ASSET

6. The defendant is in the care, custody, and control of the United States Department of the Treasury's Seized Asset Forfeiture Fund.

### TIMELY FILING

7. The defendant was subject to administrative summary forfeiture proceedings; however, John Astarita filed a claim on or about December 17, 2007.

### VALUE

8. The defendant's value is $1,150.00 in United States Currency.

. . .

. . .

. . .

## FACTS

### The Jelinsky Organization

9. In or about 2005 to in or about 2007, Michael Jelinsky and Jeffrey Jelinsky ("Jelinskys") operated an illegal gambling business involving unlicensed bookmaking in violation of Nevada State law and federal law. Jeffrey Jelinsky, Michael Jelinsky, Barbara Jelinsky, Leigh Jelinsky, Kristie Gulia, David Datzkow, Nicholas Masesso, John DeCrosta, aka Jack DeCrosta ("DeCrosta"), John Astarita ("Astarita"), Kevin Regan, Charles Pecchio, Howard Rubinsky ("Rubinsky"), Knud Christiansen ("Christiansen"), and Sanford Goldfarb ("Goldfarb") were all members of the Jelinsky Organization. The Jelinsky Organization took wagers by telephone and by internet from individuals in California, Colorado, Connecticut, Nevada, New Jersey, New York, Florida, and Texas and illegally used offshore race books, as well as casino race books in or about Las Vegas, Clark County, Nevada to layoff some of its illegal betting business. The Jelinsky Organization used interstate wire communications, among other ways, to take illegal bets, to lay off illegal bets, and to launder the illegal bookmaking proceeds. The Jelinsky Organization accepted wagers over the telephone and the internet web sites, including www.ssi28.com and www.bookmaker.com. Both internet sites are race and sports books located in Costa Rica. The Jelinsky Organization used www.ssi28.com to set up on-line wagering accounts for its clients and www.bookmaker.com to lay off some of its illegal bookmaking wagers. Jeffrey Jelinsky, Michael Jelinsky, Barbara Jelinsky, Leigh Jelinsky, Kristie Gulia, David Datzkow, Nicholas Masesso, Decrosta, Astarita, Kevin Regan, Charles Pecchio, Rubinsky, Christiansen, and Goldfarb were not licensed by the State of Nevada to operate a gambling business.

10. During the time period mentioned above, Jeffrey Jelinsky took wagers from clients by telephone and through internet accounts with a race and sports book in Costa Rica. Jeffrey Jelinsky paid a fee to the Costa Rican race and sports book for providing him with a set of customer accounts. When Jeffrey Jelinsky acquired a new betting customer who wanted to wager online, he would set up the person's account with an identification number and a password that allowed the person to logon

to www.ssi28.com and to place wagers. He also would set limits on the betting customer's wagering activity. The Costa Rican race book tracked all of the Jelinsky Organization's clients' wagering activity and maintained win/loss figures for the Jelinsky Organization.

11. During the aforementioned time, Michael Jelinsky assisted the Jelinsky Organization's illegal bookmaking operation by providing Jeffrey Jelinsky with handicapping information, financing, and laundering the illegal bookmaking proceeds. The Jelinsky Organization through Jeffrey Jelinsky and Michael Jelinsky intentionally gave fraudulent, false, and misleading handicapping information to its bettors to insure they would lose their bets to the Jelinsky Organization. Barbara Jelinsky assisted the Jelinsky Organization's illegal bookmaking operation with financing and laundering the illegal bookmaking proceeds. Leigh Jelinsky and Kristie Gulia assisted the Jelinsky Organization's illegal bookmaking operation by laundering the illegal bookmaking proceeds. Goldfarb was a client bettor of the Jelinsky Organization and assisted the Jelinsky Organization's illegal bookmaking operation by laundering the illegal bookmaking proceeds. The Jelinsky Organization included individuals and illegal bookmakers with access to large amounts of cash and casino chips who assisted the Jelinsky Organization by transferring cash and casino chips between the Jelinsky Organization and bettors and by collecting and paying illegal bets won and lost.

12. In or about 2005 to in or about 2007, James Scott, Louis J. Tavano, and Richard Tavano assisted the Jelinsky Organization's illegal bookmaking operation by establishing bettors' accounts with International Racing Group ("IRG"), an offshore race book that claimed to be on the Island of Curacao, Netherland Antilles, but also was managed and operated in part in Nevada. IRG was a subsidiary of Youbet.com. IRG provided telephonic race book services by allowing its customers to call by telephone and place wagers on horse races. Rubinsky assisted the Jelinsky Organization's illegal bookmaking operation by establishing an offshore account with www.bookmaker.com, an offshore race and sports book located in Costa Rica, to layoff some of the betting accepted by the Jelinsky Organization's illegal bookmaking operation. By having the betting account at

. . .

www.bookmaker.com and laying off bets accepted by the Jelinsky Organization, it reduced the payout risk associated with booking some of the large wagers.

### The Poker Palace Casino, the Palms Casino, and the Jelinsky Organization

13. During various times in or about 2005 to in or about 2007, the Jelinsky Organization conducted its illegal bookmaking inside the Poker Palace Casino and the Palms Casino, in or about Las Vegas, Clark County, Nevada and North Las Vegas, Clark County, Nevada. By conducting business inside these casinos the Jelinsky Organization had up-to-date race and sports book information and the ability to layoff quickly any wagers the Jelinsky Organization considered too risky to keep within its illegal bookmaking. David Datzkow, Nicholas Masesso, Decrosta, Astarita, Kevin Regan, and Charles Pecchio assisted the Jelinsky Organization's illegal bookmaking operation as runners who placed bets with the licensed casino race books on behalf of the Jelinsky Organization and collected money from winning bets with licensed casino race books and from bettors who bet with the Jelinsky Organization. The size of the Jelinsky Organization's illegal bookmaking is shown by the increase of the Poker Palace Casino race book handle when the Jelinsky Organization operated there. (The handle is the gross amount of money risked in pari-mutuel wagering. Pari-mutuel wagering is a system of betting on horse races whereby all wagers go into a pool. The winners divide the total amount of all bets, after deducting management expenses, in proportion to the sums they have wagered individually. Pari-mutuel watering provides no risk to the Poker Palace Casino.) In or about April 2005, before one of the various times the Jelinsky Organization laid off wagers at the Poker Palace Casino in pari-mutuel wagering, the Poker Palace Casino race book's monthly handle was approximately $100,000. By October 2005, after the Jelinsky Organization began using the Poker Palace Casino to lay off wagers, the Poker Palace Casino race book's monthly handle had risen to over $10,000,000. Similarly, in or about November 2005, the monthly pari-mutuel handle at the Palms Casino race book was approximately $200,000. By July 2006, after the Jelinsky Organization began operating its illegal bookmaking at the Palms Casino, its monthly handle was approximately $7,100,000. Between the Poker Palace Casino, the Palms Casino, and the offshore accounts, the

Jelinsky Organization wagered millions of dollars each month.

14. On or about April 4, 2007, the Jelinsky Organization moved part of their operation from the Palms Casino back to the Poker Palace Casino. The Jelinsky Organization operated its illegal bookmaking at the Poker Palace Casino by laying off wagers and used the Poker Palace Casino to generate and to launder some of the proceeds the Jelinsky Organization's activities generated. The Poker Palace Casino's management and the Jelinsky Organization illegally agreed and conspired to give the Jelinsky Organization approximately an eleven percent (11%) rebate of, or share in the revenues of, the Jelinsky Organization's pari-mutuel wagering. The Poker Palace Casino and the Jelinsky Organization agreed the Poker Palace Casino would rebate the Jelinsky Organization 11% if it bet $250,000 a week and would rebate the Jelinsky Organization up to 12% if it bet over $500,000 a week. The Poker Palace Casino held contests that insured members of the Jelinsky Organization would win the contest receiving the 11% rebate. The contest was an artificial mechanism designed solely to rebate money to the Jelinsky Organization. The Poker Palace Casino and the Jelinsky Organization determined the amount of each contest based upon what the Jelinsky Organization wagered for the week. For example, if the Jelinsky Organization had a handle of $400,000 for the week, the Poker Palace Casino arranged to have two contests for $22,000 each, thereby rebating to the Jelinsky Organization $44,000, or 11% of their handle. This arrangement between the Poker Palace Casino and the Jelinsky Organization allowed the Jelinsky Organization to receive an 11% no-risk return on their wagering activity. At least three key employees at the Poker Palace Casino conspired with the Jelinsky Organization to arrange and to facilitate the fixed contest. This rebate arrangement laundered illegal proceeds by giving the appearance that these monies were derived from legitimate gambling activity.

15. On June 24, 2007, DeCrosta sent Astarita to give Jeffrey Jelinsky the $5,000.00 entry fee for the Poker Palace Casino rebate contest and his figures (the amount DeCrosta wagered at the Poker Palace Casino for the week) so Jeffrey Jelinsky could determine DeCrosta's rebate. On July 2, 2007, Jeffrey Jelinsky and Joe Bahel ("Bahel"), the Director of Operations at the Poker Palace Casino,

arranged two rebate contests of $11,300.00 each for the next day and agreed to an 11.5 % rebate for that week. Bahel also warned the percentage of the handle would go down if the Jelinsky Organization did not raise its handle. Jeffrey Jelinsky admitted numerous times that the Poker Palace Casino contests were rigged and were very good for the Jelinsky Organization. Michael Jelinsky admitted numerous times that the Poker Palace Casino contests were fictitious, allowing rebates to be paid to the Jelinsky Organization. DeCrosta and Astarita were involved in the Poker Palace Casino rebating contests for the Jelinsky Organization and themselves. On July 30, 2007, Michael Jelinsky requested that Bahel change the date of the rebating contest because Michael Jelinsky had problems getting enough people to go to the Poker Palace Casino. The Poker Palace Casino required the Jelinsky Organization to have at least four people at the rebate contest. Bahel agreed to two rebating contests on another day for $33,600 each. The Jelinsky Organization won all the rebating contests because the Poker Palace Casino and the Jelinsky Organization had the rebating contests fixed to insure the Jelinsky Organization won.

16. Effective June 30, 2007, Nevada Gaming Regulation 6A, which provided Nevada casinos with an exemption from the Bank Secrecy Act ("BSA") requirements, expired. Starting July 1, 2007, Nevada casinos were required to comply with all BSA regulations, which include filing Currency Transaction Reports ("CTR") for any cash transaction over $10,000.00. As a result of the CTR regulations, DeCrosta was concerned he could no longer wager over $10,000.00 a day. To avoid the CTR reporting requirements, DeCrosta wanted to limit his wagering to $8,000.00 a day. DeCrosta operated his own illegal bookmaking and messenger betting business and used the rebate contest at the Poker Palace Casino to lay off some of his action and collect the rebate. On June 30, 2007, to avoid the CTR reporting requirements, DeCrosta discussed an arrangement that Astarita would bet all of Johnny's money at the Poker Palace Casino. Johnny is one of DeCrosta's clients in his illegal gambling business. DeCrosta decided to keep wagering for his client, Paul, because Paul did not bet over the $10,000.00 per day at the Poker Palace Casino. DeCrosta's actions were to avoid the CTR reporting requirements for any cash transaction over $10,000.00. DeCrosta structured his illegal

activities at the Poker Palace Casino, which violates federal law and state law. On or about June 30, 2007, the Poker Palace Casino management agreed to work with DeCrosta to avoid the CTR reporting requirements. On or about June 30, 2007, the Poker Palace Casino Race and Sports Book manager, William Reynolds, arranged for DeCrosta to bet under two separate players' numbers to structure his illegal bookmaking wagers, allowing DeCrosta to avoid the CTR reporting requirements. On July 9, 2007, DeCrosta had wagered for his illegal gambling clients a total of $90,122.00 under three separate players' numbers, provided by the Poker Palace Casino, so that he avoided the CTR reporting requirements. On or about July 9, 2007, DeCrosta also bet $8,200.00 at the Poker Palace Casino for Michael Jelinsky under player number 72 and gave Michael the rebate for this wager.

17. Joseph Kreyer ("Kreyer") worked for the Poker Palace Casino in the late 1990s as a ticket writer in the Race and Sports Book. At that time, the Poker Palace Casino ran a handicapping contest designed to offer rebates to high volume players. Kreyer left Las Vegas to work at the Tonkowa Indian reservation. Kreyer returned to Las Vegas in 2005, approached Brad Fetuish ("Fetuish"), General Manager of the Poker Palace Casino, and requested that Fetuish start running the rebating contests again. Kreyer negotiated the contest with Fetuish, and during the negotiations, Kreyer asked Fetuish if he wanted 17% on $10,000 or 4.5% on a couple million dollars. Kreyer recruited the Jelinsky Organization to play at the Poker Palace Casino. Kreyer negotiated the rebate with each player. Kreyer negotiated the day and time of each contest with Bahel. The contest rules required four contestants. Kreyer paid other individuals to enter the contest. Kreyer put up the entrance fee of $2,500 and paid each person $50 for entering. The entrance fee was set very high so that no players except the associates of the Jelinsky Organization would enter. Michael Jelinsky's handle was put under Kreyer's player number 61. Fetuish and Bahel knew Michael Jelinsky's handle was under player number 61.

18. Between April 2005 and September 2007, the increase in revenues generated by the Poker Palace Casino as a result of the illegal rebating contest was approximately $7,900,000.00.

. . .

### John DeCrosta and the Jelinsky Organization

19. Between 2005 and 2007, John DeCrosta illegally placed horse race bets for the Jelinsky Organization, assisting the Jelinsky Organization in their illegal bookmaking and illegal gambling business. DeCrosta operated his own illegal messenger betting operation, including placing horse race bets. DeCrosta placed interstate telephone calls in the State of Nevada and outside the State of Nevada, providing information on available wagers, placing horse race bets, and discussing balances owed or paid on the bets. He placed bets for players, including Michael Jelinsky, Paul Mattise, and John Egidio, among others, who used him as their agent. DeCrosta participated and received rebates of money from pari-mutuel bets in the illegal rebating conspiracy with the Jelinsky Organization and the Poker Palace Casino. DeCrosta conspired with the Jelinsky Organization and the Poker Palace Casino to structure money, and did structure money, to avoid the banking reporting requirements.

### Howard Rubinsky, Knud Christiansen, and the Jelinsky Organization

20. Between 2005 and 2007, Rubinsky engaged in the business of betting and wagering, using wire communications to transmit in interstate and foreign commerce bets, wagers, and information to assist the placing of bets and wagers on sporting events, contests, and horse racing. Rubinsky assisted the Jelinsky Organization in its illegal bookmaking and illegal gambling business. Christiansen participated in the illegal bookmaking business in Nevada. Christiansen moved money between Rubinsky and the Jelinsky Organization. Rubinsky established illegal wagering accounts for the Jelinsky Organization with www.bookmasker.com in Costa Rica. Rubinsky assisted the Jelinsky Organization by moving money between the Jelinsky Organization and its wagering clients and associates. Rubinsky lived in Florida and used the interstate telephone calls to communicate with the Jelinsky Organization.

21. Between 2005 and 2007, Rubinsky participated in numerous financial transactions to launder the proceeds of the illegal bookmaking operation of the Jelinsky Organization. On July 6, 2007, Jeffrey Jelinsky met with Goldfarb and collected $50,000 in Wynn Casino gaming chips for payment on an illegal gambling debt. On July 10, 2007, Jeffrey Jelinsky left Rubinsky a message,

stating he had $50,000 for him in Wynn gaming chips. On July 10, 2007, while Rubinsky was in Florida and Jeffrey Jelinsky was in Nevada, they discussed that the Jelinsky Organization owed Rubinsky $50,000. On July 11, 2007, Jeffrey Jelinsky met with Christiansen and gave him the $50,000 in Wynn Casino gaming chips for Rubinsky. On July 24, 2007, Jeffrey Jelinsky arranged to have Goldfarb wire $100,000 to HSBC Bank account in the name of Laurence Feingold Attorney Trust Account, pursuant to the instructions of Rubinsky. These monies were then wired, in two separate transactions, from the HSBC account to Rubinsky and an associate of Rubinsky in Las Vegas. On August 22, 2007, Jeffrey Jelinsky and Rubinsky engaged in a telephone call between Nevada and Florida, during which Rubinsky instructed Jeffrey Jelinsky to have Goldfarb wire $65,000 into an escrow account at City National Bank, held in a third party name. These monies were subsequently wired to the escrow account and then a check from the third party was deposited into an account held by Rubinsky. All of these monies represent the money laundered proceeds of illegal bookmaking and illegal gambling.

## Sandy Goldfarb and the Jelinsky Organization

22. Between 2005 and 2007, Goldfarb made numerous telephone calls to the Jelinsky Organization. In the majority of these calls, Goldfarb placed wagers with Jeffrey Jelinsky, discussed wagering activity, or discussed account balances. When Jeffrey Jelinsky received Goldfarb's wagers, Jeffrey Jelinsky either booked the wagers himself or made telephone calls to www.bookmaker.com race book to layoff Goldfarb's wagers. Jeffrey Jelinsky had Goldfarb launder some of the illegal gambling proceeds by wire transferring money to bank accounts provided by Rubinsky. Then Rubinsky had an associate deliver the money to the Jelinsky Organization in Las Vegas. The Jelinsky Organization used the money to pay other clients and to promote the illegal bookmaking and illegal gambling activities. Goldfarb assisted the Jelinsky Organization in laundering the proceeds of its illegal bookmaking operation by facilitating the movement of money between the Jelinsky Organization, its clients, and its associates. The Jelinsky Organization compensated Goldfarb usually in the form of a reduction in his gambling debt for his assistance in laundering the illegal proceeds.

23. On June 20, 2007, Goldfarb wire transferred $30,000 to Blackthorn Estate Buyers, a company owned by Craig Bagon, to pay a gambling debt owed by the Jelinsky Organization. On July 6, 2007, Goldfarb obtained $50,000 in Wynn gambling chips and gave them to Jeffrey Jelinsky. The Jelinsky Organization paid its gambling debt to Rubinsky with the $50,000 in Wynn gambling chips. On July 25, 2007, Goldfarb wired transferred $100,000 to HSBC Bank with part of that money being laundered through additional accounts until Rubinsky received some of the money. The Jelinsky Organization paid its gambling debt to Rubinsky through Goldfarb. On August 23, 2007, Goldfarb wire transferred $60,000 to an Escrow Account to pay a gambling debt owed to Rubinsky by the Jelinsky Organization.

### John Astarita and the Jelinsky Organization

24. Between 2005 and 2007, Astarita was a member of the Jelinsky Organization and ran his own illegal bookmaking business and messenger betting service. Astarita was also a regular participant in the Poker Palace Casino contest. Astarita wagered large amounts of money at the Poker Palace Casino and received a rebate by means of the fictitious contest. Astarita was a messenger bettor for the Jelinsky Organization and John Egidio. Astarita placed illegal wagers through bookmakers located outside the State of Nevada and laid off wagers through offshore casinos, including www.bookmaker.com. Astarita made numerous calls to Costa Rica to place illegal bets with www.bookmaker.com. He also placed illegal bets with Euro Off-track in the British Isles. Astarita had weekly summaries of his clients account balances, with daily logs of each client's detailed wagering information and activities for each day. Astarita has no other source of income except his illegal bookmaking business and messenger betting service.

25. On June 24, 2007, DeCrosta sent Astarita to give Jeffrey Jelinsky the $5,000.00 entry fee for the Poker Palace Casino rebate contest and his figures (the amount DeCrosta wagered at the Poker Palace Casino for the week) so Jeffrey Jelinsky could determine DeCrosta's rebate. On June 25, 2007, Astarita provided $10,000 to the Jelinsky Organizatin through Jeffrey Jelinsky for the Poker Palace Casino contest. On July 14 and 16, 2007, Astarita admitted operating his own illegal gambling

business and not wagering his own money. On July 18, 2007, the Jelinsky Organization delivered money to Astarita from the Poker Palace Casino contest, and Astarita paid Robert Black $110,000 for an illegal gambling debt.

26. In August 2007, the Poker Palace Casino conducted ten rigged rebate contests. A total of $385,800.00 was paid out to the Jelinsky Organization. All contest payments were made in cash. In September 2007, the Poker Palace Casino conducted seven rigged rebate contests. A total of $214,300.00 was paid out to the Jelinsky Organization. All contest payments were made in cash. For the months of August and September 2007, Astarita's total pari-mutuel handle at the Poker Palace Casino was at least $731,465.20. Astarita received at least $73,146 in cash payments from the Poker Palace Casino contest over this period. Astarita averaged approximately 12% of the total contest payout at Poker Palace Casino. The total cash payouts from the contest at the Poker Palace Casino, between April 2007 and July 2007, were $1,185,200. Astarita collected approximately $142,000 in contest payouts between April 2007 and July 2007, for a total of $215,146 in cash payments from the contest between April 2007 and September 2007. Astarita stored his illegal bookmaking and messenger runner service at the Rampart Casino safe deposit box number 77. Astarita accessed the box on a weekly basis, sometimes more than once a day. All of Astarita's seized money represents proceeds from his illegal gambling activities. Astarita did not have any other source of legitimate income over this period of time. Astarita was involved in operating an illegal gambling business, to include messenger betting, illegal bookmaking, and illegal wagering with offshore and out of state bookmakers. Astarita was also involved in money laundering and structuring.

**FIRST CAUSE OF ACTION**

27. The United States realleges, readopts, and reincorporates all the allegations contained in paragraphs 1 through 26 fully set forth herein.

28. The defendant is involved in a transaction or attempted transaction in violation of 18 U.S.C. § 1956(a)(1), or is property traceable to such property, and is subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A).

## SECOND CAUSE OF ACTION

29. The United States realleges, readopts, and reincorporates all the allegations contained in paragraphs 1 through 26 as though fully set forth herein.

30. The defendant is involved in a transaction or attempted transaction in violation of 18 U.S.C. § 1956(a)(2), or is property traceable to such property, and is subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A).

## THIRD CAUSE OF ACTION

31. The United States realleges, readopts, and reincorporates all the allegations contained in paragraphs 1 through 26 as though fully set forth herein.

32. The defendant is involved in a transaction or attempted transaction in violation of 18 U.S.C. § 1957, or is property traceable to such property, and is subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A).

## FOURTH CAUSE OF ACTION

33. The United States realleges, readopts, and reincorporates all the allegations contained in paragraphs 1 through 26 as though fully set forth herein.

34. The defendant constitutes, or is derived from, proceeds traceable to violations of 18 U.S.C. § 1084 and Nev. Rev. Stat. §§ 199.480, 463.160, 463.430, 464.010, 465.092, and 465.093, a specified unlawful activity as defined in 18 U.S.C. §§ 1956(c)(7)(A) and 1961(1)(B), or a conspiracy to commit such offense, and is subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C).

## FIFTH CAUSE OF ACTION

35. The United States realleges, readopts, and reincorporates all the allegations contained in paragraphs 1 through 26 as though fully set forth herein.

36. The defendant constitutes, or is derived from, proceeds traceable to violations of 18 U.S.C. § 1341, a specified unlawful activity as defined in 18 U.S.C. §§ 1956(c)(7)(A) and 1961(1)(B), or a conspiracy to commit such offense, and is subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C).

## SIXTH CAUSE OF ACTION

37. The United States realleges, readopts, and reincorporates all the allegations contained in paragraphs 1 through 26 as though fully set forth herein.

38. The defendant constitutes, or is derived from, proceeds traceable to violations of 18 U.S.C. § 1343, a specified unlawful activity as defined in 18 U.S.C. §§ 1956(c)(7)(A) and 1961(1)(B), or a conspiracy to commit such offense, and is subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C).

## SEVENTH CAUSE OF ACTION

39. The United States realleges, readopts, and reincorporates all the allegations contained in paragraphs 1 through 26 as though fully set forth herein.

40. The defendant constitutes, or is derived from, proceeds traceable to violations of 18 U.S.C. § 1952(a)(1) and Nev. Rev. Stat. §§ 199.480, 463.160, 463.430, 464.010, 465.092, and 465.093, a specified unlawful activity as defined in 18 U.S.C. §§ 1956(c)(7)(A) and 1961(1)(B), or a conspiracy to commit such offense, and is subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C).

## EIGHTH CAUSE OF ACTION

41. The United States realleges, readopts, and reincorporates all the allegations contained in paragraphs 1 through 26 as though fully set forth herein.

42. The defendant constitutes, or is derived from, proceeds traceable to violations of 18 U.S.C. § 1952(a)(3) and Nev. Rev. Stat. §§ 199.480, 463.160, 463.430, 464.010, 465.092, and 465.093, a specified unlawful activity as defined in 18 U.S.C. §§ 1956(c)(7)(A) and 1961(1)(B), or a conspiracy to commit such offense, and is subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C).

## NINTH CAUSE OF ACTION

43. The United States realleges, readopts, and reincorporates all the allegations contained in paragraphs 1 through 26 as though fully set forth herein.

44. The defendant constitutes, or is derived from, proceeds traceable to violations of 18 U.S.C. § 1955 and Nev. Rev. Stat. §§ 199.480, 463.160, 463.430, 464.010, 465.092, and 465.093, a

specified unlawful activity as defined in 18 U.S.C. §§ 1956(c)(7)(A) and 1961(1)(B), or a conspiracy to commit such offense, and is subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C).

## TENTH CAUSE OF ACTION

45. The United States realleges, readopts, and reincorporates all the allegations contained in paragraphs 1 through 26 as though fully set forth herein.

46. The defendant constitutes, or is derived from, proceeds traceable to violations of 18 U.S.C. § 1956(a)(1), a specified unlawful activity as defined in 18 U.S.C. § 1956(c)(7)(A) and 1961(1)(B), or a conspiracy to commit such offense, and is subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C).

## ELEVENTH CAUSE OF ACTION

47. The United States realleges, readopts, and reincorporates all the allegations contained in paragraphs 1 through 26 as though fully set forth herein.

48. The defendant constitutes, or is derived from, proceeds traceable to violations of 18 U.S.C. § 1956(a)(2), a specified unlawful activity as defined in 18 U.S.C. § 1956(c)(7)(A) and 1961(1)(B), or a conspiracy to commit such offense, and is subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C).

## TWELFTH CAUSE OF ACTION

49. The United States realleges, readopts, and reincorporates all the allegations contained in paragraphs 1 through 26 as though fully set forth herein.

50. The defendant constitutes, or is derived from, proceeds traceable to violations of 18 U.S.C. § 1957, a specified unlawful activity as defined in 18 U.S.C. § 1956(c)(7)(A) and 1961(1)(B), or a conspiracy to commit such offense, and is subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C).

## THIRTEENTH CAUSE OF ACTION

51. The United States realleges, readopts, and reincorporates all the allegations contained in paragraphs 1 through 26 as though fully set forth herein.

52. The defendant is involved in violations of 31 U.S.C. § 5313, or a conspiracy to commit such violations, or is traceable to any such violations or conspiracy, and is subject to forfeiture pursuant to 31 U.S.C. § 5317(c)(2).

## FOURTEENTH CAUSE OF ACTION

53. The United States realleges, readopts, and reincorporates all the allegations contained in paragraphs 1 through 26 as though fully set forth herein.

54. The defendant is involved in violations of 31 U.S.C. § 5324, or a conspiracy to commit such violations, or is traceable to any such violations or conspiracy, and is subject to forfeiture pursuant to 31 U.S.C. § 5317(c)(2).

## CONCLUSION

Because of the foregoing, the defendant is subject to seizure and to forfeiture and has become and is forfeited to the United States of America, plaintiff, under 18 U.S.C. § 981(a)(1)(A) and (C) and 31 U.S.C. § 5317(c)(2).

WHEREFORE, the United States of America, Plaintiff, prays as follows:

1. Due process issue to enforce the forfeiture of the defendant;

2. Due notice be given to any interested party to appear and to show cause why the forfeiture should not be decreed;

3. The defendant be condemned and be forfeited to the United States; and

4. This Court enter other and further relief as it deems just and proper.

DATED this 8th day of January, 2010

Respectfully submitted,

DANIEL G. BOGDEN
United States Attorney

DANIEL D. HOLLINGSWORTH
Assistant United States Attorney

16

## VERIFICATION

I, Laura Hodgdon, am the Special Agent of the United States Immigration & Customs Enforcement assigned to this case. I have read the contents of the foregoing Complaint for Forfeiture In Rem. I declare and verify under penalty of perjury that the foregoing is true and correct pursuant to 28 U.S.C. § 1746(2).

Executed on January 8, 2010.

Laura Hodgdon, Special Agent
United States Immigration & Customs Enforcement

%JS 44 (Rev. 11/04)

# CIVIL COVER SHEET

ORIGINAL

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS
United States of America

**DEFENDANTS**
$1,150.00 in United States Currency

(b) County of Residence of First Listed Plaintiff: Clark
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant: Clark
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

(c) Attorney's (Firm Name, Address, and Telephone Number)
United States Attorney's Office, Daniel D. Hollingsworth, AUSA, 333 Las Vegas Blvd. South, Suite 5000, Las Vegas, NV 89143

Attorneys (If Known)
2:10-cv-0032-RLH-GWF

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☒ 1 U.S. Government Plaintiff
☐ 2 U.S. Government Defendant
☐ 3 Federal Question (U.S. Government Not a Party)
☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant) (For Diversity Cases Only)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** / **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane / ☐ 362 Personal Injury - Med. Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 |  | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 365 Personal Injury - Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 320 Assault, Libel & Slander | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 330 Federal Employers' Liability | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 480 Consumer Credit |
|  | ☐ 340 Marine / **PERSONAL PROPERTY** | ☒ 690 Other |  | ☐ 490 Cable/Sat TV |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 345 Marine Product Liability / ☐ 370 Other Fraud |  |  | ☐ 810 Selective Service |
| ☐ 160 Stockholders' Suits | ☐ 350 Motor Vehicle / ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/Exchange |
| ☐ 190 Other Contract | ☐ 355 Motor Vehicle Product Liability / ☐ 380 Other Personal Property Damage | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal Injury / ☐ 385 Property Damage Product Liability | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise |  | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** / **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | ☐ 864 SSID Title XVI | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting / ☐ 510 Motions to Vacate Sentence | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | ☐ 791 Empl. Ret. Inc. Security Act | **FEDERAL TAX SUITS** | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/Accommodations / **Habeas Corpus:** |  | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 895 Freedom of Information Act |
| ☐ 240 Torts to Land | ☐ 530 General |  | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare / ☐ 535 Death Penalty |  |  |  |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - Employment / ☐ 540 Mandamus & Other |  |  | ☐ 950 Constitutionality of State Statutes |
|  | ☐ 446 Amer. w/Disabilities - Other / ☐ 550 Civil Rights |  |  |  |
|  | ☐ 440 Other Civil Rights / ☐ 555 Prison Condition |  |  |  |

## V. ORIGIN (Place an "X" in One Box Only)

☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
28 U.S.C 1345ff

Brief description of cause:
Asset Forfeiture seeking the forfeiture of the defendant property.

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23
DEMAND $
CHECK YES only if demanded in complaint:
JURY DEMAND: ☐ Yes ☒ No

## VIII. RELATED CASE(S) IF ANY
(See instructions):
JUDGE
DOCKET NUMBER

DATE: January 8, 2010
SIGNATURE OF ATTORNEY OF RECORD: Daniel D. Hollingsworth

**FOR OFFICE USE ONLY**
RECEIPT #     AMOUNT     APPLYING IFP     JUDGE     MAG. JUDGE